IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB - 4 2013

CLERK, U.S. DISTRICT COURT
By_____
                    Deputy

| | | |
|---|---|---|
| SHEILA JOHNSON, | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | No. 3:11-CV-3126-L (BF) |
| | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| **Defendant.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

This is an appeal from the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying the claim of Sheila Johnson ("Plaintiff") for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act (the "Act"). The Court considered Plaintiff's Brief, Defendant's Response Brief, and Plaintiff's Reply Brief. The Court reviewed the record in connection with the pleadings. The Court recommends that the final decision of the Commissioner be AFFIRMED.

## Background[1]

**Procedural History**

On March 2, 2007, Plaintiff filed an application for SSI benefits. (Tr. 107.) In her application, Plaintiff alleged a disability onset date of October 1, 2005, due to congestive heart failure, diabetes, high blood pressure, and hepatitis C. (Tr. 107, 205-07, 224, 236.) The application was denied initially and upon reconsideration. (Tr. 91.)

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

Plaintiff requested a hearing, which was held on October 15, 2008. (Tr. 15-43.) Plaintiff testified at the hearing as well as two of her witnesses, James and Olivia Lloyd. (Tr. 15.) Plaintiff was not represented by counsel. (Tr. 18.) On February 5, 2009, the Administrative Law Judge ("ALJ") issued an unfavorable decision. (Tr. 91-98.) Plaintiff requested review from the Appeals Council, who remanded the case back to the ALJ on September 18, 2009. (Tr. 100-03.)

Upon remand, the ALJ held a second hearing on April 29, 2010. (Tr. 44-81.) Plaintiff testified at the hearing, along with a vocational expert ("VE") and a medical expert ("ME"), Dr. Barbara Felkins. (*Id.*) Plaintiff was represented by counsel at the hearing. (Tr. 44.) The ALJ again issued an unfavorable decision on July 1, 2010. (Tr. 107-18.) Plaintiff requested review of this decision from the Appeals Council on July 19, 2010. (Tr. 12.) However, the Appeals Council denied the request for review on October 19, 2011. (Tr. 1-6.) Thus, the ALJ's decision became the final decision of the Commissioner from which Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

**Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on November 13, 1966, making her 43 years old at the time of her second hearing. (Tr. 48, 97.) Plaintiff was 40 years old when she filed her application for disability. (Tr. 97.) Plaintiff has a ninth grade education. (Tr. 49.) She did not obtain a GED. (*Id.*) Plaintiff is 5'9" tall and weighs 180 pounds. (Tr. 52-53.) Plaintiff has no past relevant work. (Tr. 78.)

**Plaintiff's Medical Evidence**

Plaintiff's medical records are extensive, containing approximately 2,500 pages of treatment records. The majority of the records concern Plaintiff's physical impairments, however, there are

some records regarding Plaintiff's mental impairments as well. The Court will summarize the relevant medical evidence.[2]

Plaintiff's treatment records date back to 1995, when Plaintiff was incarcerated in the Texas Department of Criminal Justice ("TDCJ").[3] (Tr. 1255-1714.) On February 19, 1997, Plaintiff reported being depressed. (Tr. 1713.) On October 17, 2002, Plaintiff again reported being depressed and also having suicidal ideation, but no actual plan to commit suicide. (Tr. 1432.) Plaintiff told the clinician that she attempted to cut her skin with bobby pins, but no cuts were observed by the clinician. (*Id.*) The following day, Plaintiff threatened to hurt herself and it was noted that she was suicidal. (Tr. 1420.) She was not given an Axis I diagnosis. (*Id.*) On November 12, 2002, a personality test was conducted and found to be invalid. (Tr. 1446.) The examiner noted that the test results indicated that Plaintiff "attempted to portray herself in an especially negative manner." (*Id.*) The examiner further noted "[t]his could have been the result of either careless responding, extremely negative self-presentation, or malingering." (*Id.*) Regardless, Plaintiff's test scores were not subject to clinical interpretation and found invalid. (*Id.*)

Prior to Plaintiff's release from the TDCJ, a case summary was performed on August 25, 2003. (Tr. 1377-78.) The physician assistant made notations that Plaintiff had the following problems: asthma, diabetes mellitus, eye irritation, hepatitis C, no diagnosis on Axis I or Axis II, staph infection, hypertension, and visual loss. (*Id.*) Over the course of her nine years at the TDCJ,

---

[2] The Court notes that Plaintiff's allegations largely concern her mental impairments, not her physical impairments. Thus, the Court declines to go into great detail in summarizing the medical records regarding Plaintiff's physical impairments.

[3] Plaintiff was incarcerated from 1994 to 2003 for possession of a controlled substance. (Tr. 54.)

Plaintiff never received psychiatric treatment and she was never given an Axis I or Axis II diagnosis. (Tr. 70, 1377.)

On November 15, 2005, Plaintiff reported to Parkland Memorial Hospital ("Parkland") complaining of swelling and pain in her foot. (Tr. 305-06.) The nurse noted that Plaintiff had been out of her blood pressure medication for 2-4 weeks. (*Id.*) On December 15, 2005, a physical exam revealed poorly controlled hypertension and mild bilateral lower extremity edema. (Tr. 307-08.) The exam was otherwise normal and her lab results were within normal limits. (*Id.*) On October 5, 2006, Plaintiff reported to Baylor University Medical Center ("Baylor") complaining of shortness of breath. (Tr. 480.) She was diagnosed with congestive heart failure and poorly controlled hypertension. (Tr. 480-81.) Plaintiff tested positive for cocaine use. (Tr. 477.) Plaintiff against tested positive for cocaine use on October 16, 2006. (Tr. 370.) On January 25, 2007, Plaintiff presented to Parkland with headaches and blurry vision. (Tr. 645-46.) The doctor noted that she had used cocaine two days prior and she had been out of her blood pressure medication for two weeks. (Tr. 645.) Plaintiff was diagnosed with cocaine use and uncontrolled hypertension. (Tr. 646.) Subsequent blood tests revealed negative results for cocaine use. (Tr. 662, 700, 1025, 1102, 1109, 2095.)

The record is replete with evidence of Plaintiff's trips to the emergency room at Baylor and Parkland. However, each time she was admitted, she was discharged in either stable or improved condition and the doctors did not find anything neurologically wrong with her. (Tr. 71-72.) Plaintiff was admitted to Baylor from February 25, 2008 through February 29, 2008. (Tr. 2026-28.) MRI and MRA results showed no evidence of an acute stroke and her left-sided paresthesias were secondary to uncontrolled hypertension. (Tr. 2027.) Plaintiff's diabetes was noted as uncontrolled and she was instructed on the importance of being compliant with insulin. (*Id.*) At the time of discharge, her

blood pressure was better controlled. (*Id.*) However, Plaintiff did not take the medications prescribed to her and she was again admitted to the hospital on March 23, 2008. (Tr. 2101.) According to Plaintiff, she was unable to fill her prescriptions through Medicaid. (*Id.*) Plaintiff advised the doctor that she "uses crack and marijuana occasionally." (Tr. 2102.) She was discharged the next day in stable condition. (*Id.*)

On October 21, 2009, Plaintiff was admitted to Parkland due to complaints of shortness of breath and hypoglycemia. (Tr. 2631-32.) Plaintiff reported being out of insulin for 2 days. (Tr. 2632.) She was released that same date, and it was noted that she was feeling improved and her vitals were stable. (Tr. 2634.) Her insulin was refilled. (*Id.*) On November 5, 2009, Plaintiff presented to Baylor with left ear pain. (Tr. 2396-97, 2596.) She reported that "it feels like there's something in my ears." (Tr. 2397.) The nurse noted that Plaintiff's tympanic membrane on her left ear was reddened. (*Id.*) She was discharged in stable condition and it was noted that her symptoms had improved. (Tr. 2397, 2597.) The doctor's impression was an earache without an infection. (Tr. 2597.) On December 26, 2009, Plaintiff was admitted to Baylor because she suffered a stroke. (Tr. 2773.) It was noted that her speech was slurred and that this was a single incident. (Tr. 2782.) She was later released, as her symptoms had improved. (Tr. 2781.)

A physical residual functional capacity assessment was completed by Dr. Bonnie Blacklock on November 29, 2006. (Tr. 509-16.) Dr. Blacklock indicated Plaintiff could perform medium-skilled work[4] and that she could stand and/or walk for a total of 6 hours in an 8-hour workday, sit

---

[4] Medium work is defined as work that involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, it can be determined that she can also do sedentary and light work. 20 C.F.R. § 404.1567(c).

for a total of 6 hours in an 8-hour workday, and push and/or pull unlimited. (Tr. 510.) The doctor indicated that there were no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (Tr. 511-13.) Dr. Blacklock diagnosed Plaintiff with diabetes and hypertension, and noted her other impairments as hepatitis C and a history of congestive heart failure and cocaine use. (Tr. 509.) The doctor made the notation that Plaintiff's allegations were not fully supported by the medical evidence in the file. (Tr. 514.)

On April 18, 2007, Dr. Terry Collier completed another physical residual functional capacity assessment of Plaintiff. (Tr. 650-57.) Dr. Collier indicated Plaintiff could perform sedentary work[5] and that she could stand and/or walk for a total of at least 2 hours in an 8-hour workday, sit for a total of 6 hours in an 8-hour workday, and push and/or pull unlimited. (Tr. 651.) The doctor noted that there were no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (Tr. 652-54.) Dr. Collier diagnosed Plaintiff with diastolic heart failure, hypertension, diabetes mellitus, and asthma. (Tr. 650.) The doctor noted an additional impairment of crack cocaine abuse. (*Id.*) The doctor made the notation that "[l]imitations alleged are partially supported by EOR [evidence of record] but exacerbations are attributed to active crack cocaine use and non compliance with meds. Out[patient] records show when compliant with meds [claimant's] symptoms are not so severe as to preclude all work." (Tr. 655.)

---

[5] Sedentary work is work that involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

Plaintiff alleges mental impairments as well. On March 23, 2008, a psychiatric evaluation was performed at Baylor. (Tr. 2099.) Plaintiff complained of depression and anxiety due to losing her housing. (*Id.*) She reported a history of cocaine and marijuana use, but being clean for two years. (*Id.*) Plaintiff was diagnosed with depression and anxiety due to social stressors. (*Id.*) She was prescribed Celexa. (*Id.*)

Plaintiff began treatment at Metrocare on May 19, 2009. (Tr. 2603.) The psychiatrist, Dr. Sarah Rasco, noted that Plaintiff inquired about how to get SSI benefits and that she may have motivation for secondary gain. (Tr. 2607.) However, she also made the notation that Plaintiff seemed to report genuine symptoms. (*Id.*) Plaintiff reported the following symptoms: thinking people were following her, hearing voices that sound like a whisper in her ear, feeling nervous all the time, thoughts of death but no overt suicidal plan, sleeping poorly, having nightmares, and having a fair appetite and energy. (Tr. 2606.) Plaintiff was diagnosed with schizophrenia, paranoid type; cannabis abuse; and cocaine dependence. (Tr. 1718.) She was assigned a Global Assessment of Functioning ("GAF") score of 50.[6] (*Id.*) Plaintiff was placed on Risperdal and Benadryl. (Tr. 2607.)

On July 1, 2009, Plaintiff reported that she was still hearing voices and thought people were following her. (Tr. 2612.) She requested a decrease in her medication. (*Id.*) Plaintiff was continued on Benadryl and given Celexa instead of Risperdal. (Tr. 2613.) Plaintiff failed to show up for her follow-up appointment on August 28, 2009. (Tr. 2614.) On October 5, 2009, Plaintiff reported being off her medication for over a month. (Tr. 2618.) It was noted that Plaintiff's visit was for her

---

[6] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM). A GAF score of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning. *See id.*

disability form and that her last visit was in July 2009. (Tr. 2618-19.) Her medication was again changed, and she was prescribed Benadryl and Thorazine. (Tr. 2619.)

On November 11, 2009, Plaintiff denied all complaints. (Tr. 2623.) She reported that she has allergies which affect her hearing. (*Id.*) It was noted that Plaintiff was very hard of hearing. (*Id.*) Plaintiff reported that she was taking her medication. (Tr. 2624.) Plaintiff's last visit to Metrocare was on December 8, 2009. (Tr. 2625-27.) She reported being sad sometimes because it was Christmas time and that she sometimes hears voices. (Tr. 2626.) The clinician noted that she was not suicidal or homicidal, and that she had no signs of psychosis. (*Id.*) Plaintiff reported that her appetite was okay and she was sleeping well. (Tr. 2627.) Plaintiff failed to show up for her follow-up appointment on February 12, 2010. (Tr. 2628.)

A mental assessment of Plaintiff's ability to perform work-related activities was completed by Dr. Rasco on October 5, 2009. (Tr. 1741-43.) Dr. Rasco indicated that Plaintiff had an "extreme loss of ability to perform" all of the activities regarding understanding and carrying out instructions, and sustained concentration and persistence; and some of the activities regarding responding appropriately to supervision, co-workers, and usual work situations, and adapting to changes in a routine work setting. (Tr. 1741-42.) Dr. Rasco found Plaintiff to have a "substantial loss of ability" to get along with co-workers or peers without distracting them, maintain personal appearances, and to respond appropriately to changes in a routine work setting. (Tr. 1742.) The doctor found Plaintiff to be capable of "consistently performing" the ability to ask simple questions or request assistance. (Tr. 1741-42.) Dr. Rasco also marked that Plaintiff would be absent more than 4 days per month. (Tr. 1743.)

**Plaintiff's Testimony at the Hearing**

Plaintiff, represented by counsel, testified on her own behalf at the second hearing held on April 29, 2010. (Tr. 44-81.) As an initial matter, the Court notes that Plaintiff had trouble hearing the ALJ at the start of the hearing, but seemed to hear her counsel fine for the remainder of the hearing. Plaintiff testified that she is single and lives with her niece and son. (Tr. 50-51.) She does not have a driver's license. (Tr. 51.) She stated that she is still receiving treatment at Metrocare. (Tr. 52.) She testified that her last job was in 2005, cleaning houses for the Market Center. (Tr .53.) She stated that she was let go in 2006 because she kept needing to go home because of weakness in her legs. (*Id.*) Plaintiff testified that she was in prison from 1994 to 2003 for possession of a controlled substance. (Tr. 54.) She is on parole until August 21, 2010. (*Id.*) Plaintiff testified that she does not currently take any illegal drugs, and that she has been clean since 2007. (Tr. 54-55.) Plaintiff stated she does not drink alcohol. (Tr. 55.) Plaintiff testified that she worked in prison on night utility by cleaning the dorms. (Tr. 56-57.) She performed this work her entire time in prison. (Tr. 57.)

Plaintiff testified that she cannot work because she can hardly lift up a pitcher and she cannot make her own bed, drive, or get ready by herself. (Tr. 58.) Plaintiff stated that when she had her stroke, the right side of her body went limp, numb, and weak. (*Id.*) Plaintiff stated that she can bathe herself from the waist down, but her niece has to bathe her from the waist up. (Tr. 59.) Her niece also has to help her get in her shower chair. (*Id.*) She grocery shops with her niece, and she rides in a motorized chair while her niece pushes the basket. (Tr. 60.) Plaintiff stated that she has pain in both of her legs and she "just can't hardly do nothing." (*Id.*) She also stated that because of her diabetes she has trouble seeing and hearing. (*Id.*) She said that her diabetes is getting worse, but she takes her medication and eats healthy. (Tr. 61.) Plaintiff testified that she has swelling in her ankles, blurry

vision, dizziness, and sometimes she falls down. (Tr. 61-62.) She stated that she needs to go to the hospital and get her hearing checked. (Tr. 62.) Plaintiff testified that she gets chest pain and migraine headaches. (Tr. 63-64.) Plaintiff testified that sometimes she does not take all of her medications. (Tr. 65.) Plaintiff stated that on a typical day she watches television sitting down and sometimes she lays down. (Tr. 65-66.) Plaintiff said that she cannot walk the length of a football field. (Tr. 66.)

Regarding her mental impairments, Plaintiff testified that she went to Metrocare because she started hearing things and seeing shadows. (Tr. 67.) She was diagnosed with paranoid schizophrenia and placed on medication. (Tr. 67-68.) Plaintiff said that the medication made her drowsy so she quit taking it. (Tr. 68.) Plaintiff testified that she does not trust people and she does not like being around a lot of people. (*Id.*) Plaintiff stated that she goes to Metrocare every month. (*Id.*)

**The Hearing**

An ME also testified at the hearing. The ME testified that Plaintiff has fairly recently developed a hearing impairment, which seems to be attributed to her allergies or stopped-up ears. (Tr. 49-50.) The ME stated that the records do not show a very good evaluation or treatment of her hearing impairment. (*Id.*) However, there is some evidence that she has had hearing problems within the last few months. (Tr. 50.) The ME stressed that there was no definitive diagnosis or any active treatment of Plaintiff's sinusitis or allergies, or whatever was going on with her hearing. (*Id.*)

The ME testified that during Plaintiff's nine years in prison, Plaintiff had some depression complaints, but she was never given an Axis I diagnosis or psychiatric treatment. (Tr. 70.) The doctor stated that even though this time period (1993-2004) predates Plaintiff's alleged disability onset date (2005), it was important because "it's very unusual for somebody with schizophrenia to be there for nine years, and not have any treatment at all." (Tr. 71.) The ME stated that upon

Plaintiff's release from prison there was evidence of cocaine abuse, however, in the last couple of years there is no evidence of substance abuse. (*Id.*) The ME noted that Plaintiff has had multiple negative urine drug screens. (*Id.*)

The ME said that Plaintiff has been going in and out of emergency rooms for the past few years, and she mainly goes to Baylor but then she follows up at Parkland. (*Id.*) The ME said the hospitals do not share records and that creates a problem. (*Id.*) The ME explained that Plaintiff usually complains of a stroke and she will exhibit some minor signs such as slurred speech and some weakness. (*Id.*) The doctors will do a CAT scan and discover that she did have a stroke in the past and she has microvascular disease. (Tr. 71-72.) The ME stated that the microvascular disease is caused from Plaintiff's failure to take her blood pressure medication. (Tr. 72.) The ME also opined that Plaintiff goes in and out of emergency rooms because she quits taking her blood pressure medication. (*Id.*) The ME stated that the doctors started realizing that there was nothing new going on with her and they did not find anything neurologically wrong with Plaintiff. (*Id.*) The ME stated that on one visit in 2007 she was diagnosed with congestive heart failure but that was contemporaneous with cocaine abuse. (*Id.*) The ME testified that since then her heart failure has been relatively stable, however, there is some evidence of diastolic heart failure. (*Id.*) Nevertheless, her diastolic heart failure is not at the listing level. (Tr. 73.) Additionally, the ME stated that this has not been a focus of treatment and most of the treatment records show Plaintiff's diastolic heart failure as stable. (Tr. 73-74.)

The ME testified that there is evidence of diabetes mellitus, but Plaintiff only went to the emergency room due to her diabetes because she ran out of insulin. (*Id.*) The ME explained that "[t]he record is completely full of her being noncompliant with medication." (Tr. 74.) The ME said

that some parts of the record reflect that Plaintiff is unable to obtain her medication, but Plaintiff does not go to a clinic regularly and instead calls the ambulance. (Tr. 74.) The ME testified that Plaintiff does not have neuropathy or retinopathy as a result of her diabetes. (*Id.*)

Regarding Plaintiff's mental impairments, the ME stated that Plaintiff went to Metrocare five times between May and December of 2009. (*Id.*) By December of 2009, Plaintiff indicated that she was better. (*Id.*) The ME opined that "[t]he diagnosis of schizophrenia is not sustained if you look at the whole record." (Tr. 73-74.) The ME reasoned that people with schizophrenia do not tolerate jail very well and she would have had at least one episode of being overtly psychotic. (Tr. 75.) The ME again noted that there was no Axis I diagnosis or treatment given to Plaintiff while she was in prison. (*Id.*) Additionally, the ME said that Plaintiff's psychotic features are very subtle and may or may not be schizophrenic. (*Id.*) The ME testified that schizophrenics sometimes don't even complain about hearing or seeing things because they're so disorganized. (*Id.*) Furthermore, the ME explained that a schizophrenic who does not take medication for years and years will have at least one psychotic break "where they're just overtly, clearly, manifestly psychotic." (*Id.*) Plaintiff was prescribed medication which gave her side effects so she quit taking it. (Tr. 75-76.)

The ME testified that although Plaintiff did have a stroke, a multitude of doctors have reviewed her and found no evidence of ongoing stroke or any residual effects. (Tr. 76.) The ME said that Plaintiff's weakness and slurred speech always resolve. (Tr. 76.) The ME opined that Plaintiff could perform sedentary work. (*Id.*) As to her mental capacity, the ME was of the opinion Plaintiff could only perform simple tasks. (Tr. 76-77.) The ME stated that based on the medical records alone, Plaintiff did not meet or equal a medical listing and Plaintiff was capable of performing sedentary, simple work. (Tr. 77.)

A VE, Carol Kutela, also testified at the hearing regarding jobs in the national economy. The ALJ posed the following hypothetical: assume a person of Plaintiff's age, education, and experience who can sit for 6 hours in an 8-hour workday; stand and walk for 2 hours in an 8-hour workday; lift and carry 10 pounds occasionally, and 10 frequently; can push or pull 10 pounds; can only occasionally crawl, squat, stoop, or bend; cannot climb ladders or work at heights; must avoid hazardous machinery and continuous exposure to hazardous machinery; can concentrate for extended periods of time adequately; adequately interact with co-workers, public, or supervisors; respond appropriately to routine changes in the work environment; and can only perform simple, repetitive tasks. (Tr. 78.) The ALJ then asked the VE whether this hypothetical person could perform any work in the national economy. (*Id.*) The VE responded affirmatively and gave the following occupations: a clock and watch assembler, a document preparer, and a dowel inspector. (Tr. 78-79.) The VE explained that the sedentary unskilled occupational base consisted of 136 jobs, but the non-exertional limitations, the postural limitations, and the hazardous limitations for the hypothetical person would erode the occupation base down to approximately 121 occupations. (Tr. 78.) The VE testified that her testimony was consistent with the Dictionary of Occupational Titles ("DOT").[7] (Tr. 79.)

Upon cross-examination by Plaintiff's counsel, the VE indicated that hearing problems and blurry vision might have an effect on the hypothetical individual's ability to perform these occupations, depending on their extent and severity. (Tr. 79-80.) The VE also testified that the limitations posed by Dr. Rasco from Metrocare in her mental assessment would preclude any substantial gainful activity. (Tr. 80.)

---

[7] The DOT is a standardized volume of job definitions that the Social Security Administration relies on at steps 4 and 5 of its five-step disability determination process. SSR 00-4p, 2000 WL 1898704, at *2.

**The Decision**

In the July 1, 2010 decision, the ALJ analyzed Plaintiff's claim pursuant to the familiar five-step sequential evaluation process.[8] At step one, the ALJ determined that Plaintiff had not engaged in substantial work activity since her March 2, 2007 application date. (Tr. 109.) At step two, the ALJ found that Plaintiff's hypertension, stable congestive heart failure, diabetes mellitus, hepatitis C, history of substance abuse, history of cerebral vascular accident, depression, and schizophrenia were severe impairments. (Tr. 110.) At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal the requirements of any listed impairments for presumptive disability under the Social Security Regulations. (Tr. 110-111.)

Before proceeding to step four, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, which included the ability to lift and carry 10 pounds occasionally and up to 10 pounds frequently; stand and walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday. (Tr. 111.) The ALJ found that Plaintiff was unable to climb ladders, ropes, or scaffolds, or work around unprotected heights or hazardous moving machinery, but she could occasionally climb ramps and stairs. (*Id.*) In addition, the ALJ found that Plaintiff could concentrate for extended periods of time; interact appropriately with co-workers, supervisors, and the public; and respond appropriately to routine changes in the work environment. (*Id.*) The ALJ determined that Plaintiff could perform simple, repetitive tasks. (*Id.*)

---

[8] (1) Is the claimant currently working? (2) Does she have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent her from performing her past relevant work? (5) Does the impairment prevent her from doing any other work? 20 C.F.R. § 416.920.

At step four, the ALJ determined that Plaintiff had no past relevant work. (Tr. 116.) At step five, the ALJ found, based on the testimony of the VE, that Plaintiff could perform other sedentary work in the national economy, consisting of a clock/watch assembler, with 2,300 local jobs and 50,000 national jobs; document preparer, with 1,800 local jobs and 15,000 national jobs; and dowel inspector, with 3,187 local jobs and 65,000 national jobs. (Tr. 117.) Accordingly, the ALJ found that Plaintiff was capable of performing other work existing in significant numbers in the national economy. (*Id.*) Hence, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act from March 2, 2007, her application date, through July 1, 2010, the date of the decision. (Tr. 117-118.)

## **Standard of Review**

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

15

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability.

*Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies her

burden under the first four steps, the burden shifts to the Commissioner at step five to show that

there is other gainful employment available in the national economy that the claimant is capable of

performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied

either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational

testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564.

Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits

is supported by substantial evidence and to whether the proper legal standard was utilized.

*Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence

is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to

support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*,

67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its

own judgment, but rather scrutinizes the record to determine whether substantial evidence is present.

*Greenspan*, 38 F.3d at 236. However, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

## Issues

1.  Whether the ALJ failed to abide by the remand order's requirements to:

    a.  evaluate the claimant's mental impairments in accordance with the special technique described in 20 C.F.R. 416.920a by documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 C.F.R. 416.920a(c);

    b.  identify and resolve any conflicts between the occupational evidence provided by the VE and the DOT before accepting the testimony of the VE;

    c.  pose a hypothetical question to the VE that reflects "the specific capacity/limitations established by the record as a whole";

    d   base the RFC on substantial evidence, and perform a function-by-function assessment of Plaintiff's mental and physical abilities when determining the RFC.

2.  Whether the hypothetical question to the VE reasonably incorporated all disabilities of the Plaintiff recognized by the ALJ.

3.  Whether the ALJ complied with Social Security Rulings in making the implicit determination that Plaintiff's non-compliance with medical treatment precluded disability.

<u>**Analysis**</u>

**Whether the ALJ Failed to Abide by the Appeals Council's Remand Order**

<u>Evaluation of Mental Impairments with the Special Technique</u>

The remand order from the Appeals Council instructed the ALJ to: "[e]valuate the claimant's mental impairment in accordance with the special technique described in 20 C.F.R. 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 C.F.R. 416.920a(c)." (Tr. 102.) Plaintiff contends that the ALJ failed to abide by this order because in applying the special technique (1) he did not utilize the Psychiatric Review Technique ("PRT") form, (2) he failed to use expert evidence, and (3) he did not provide proper rationale for each of the four functional areas. (Pl.'s Br. 8-9.)

The Social Security Administration ("SSA") has regulations that govern the evaluation of the severity of a claimant's mental impairment. 20 C.F.R. § 416.920a. The regulations require the ALJ to use a "special technique" that involves identifying each mental impairment specifically, rating the degree of functional limitation resulting from each impairment in four broad functional areas, and using those ratings to determine the severity of each impairment. *Id.* The regulations also require the ALJ to document his application of the special technique to the claimant's mental impairments. 20 C.F.R. § 416.920a(e). Violation of a regulation constitutes reversible error and requires remand only when a reviewing court concludes that the error is not harmless. *See Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

In his second decision dated July 1, 2010, the ALJ utilized the special technique that is outlined in 20 C.F.R. § 416.920a, and documented his application of the technique, in finding that

Plaintiff's depression and schizophrenia were severe impairments. To rate the degree of Plaintiff's functional limitations, as required by the regulations, the ALJ analyzed the four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *See* 20 C.F.R. § 416.920a(c); 12.00C of the Listing of Impairments (20 C.F.R., Part 404, Subpart P, Appendix 1). While it is true that the ALJ did not utilize a PRT form in applying the special technique, such form is not required at the administrative law judge hearing and Appeals Council levels. *See* 20 C.F.R. § 416.920a(e). Instead, the regulations require:

> At the administrative law judge hearing and Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

In his decision, the ALJ found that Plaintiff had the severe impairments of depression and schizophrenia, but that considered singly and in combination, they were not at listing-level severity. (Tr. 110.) The ALJ stated that his finding was consistent with the ME's opinion that Plaintiff's mental impairments did not meet or medically equal the presumptive disability listing. (Tr. 77, 110.) The ALJ accorded great weight to the ME's opinion. (Tr. 110.) Regarding the four functional areas, the ALJ found that Plaintiff had moderate restrictions in activities of daily living; mild difficulties in social functioning; mild difficulties with regard to concentration, persistence, or pace; and no episodes of decompensation. (Tr. 111.)

At the hearing, Plaintiff testified that she spends her days watching television either sitting down or laying down. She stated that she needs assistance dressing, showering, grocery shopping, and driving. Plaintiff testified that she knows how to drive but she chooses not to because her legs are weak. Plaintiff lives with her son and niece, who help Plaintiff with the aforementioned activities. Plaintiff said that she cannot walk 100 yards and she is unable to lift a pitcher or make her own bed. The ALJ found Plaintiff's testimony not entirely credible because it was inconsistent with the medical evidence in the record and because of Plaintiff's continued non-compliance with treatment. (Tr. 112-13.) Subjective complaints must be corroborated by objective medical evidence. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). In addition, non-compliance with treatment prescribed by physicians is grounds for a finding of not disabled. *Johnson v. Sullivan*, 894 F.2d 683, 685 n.4 (5th Cir. 1990). After considering Plaintiff's testimony and the medical evidence in the record, the ALJ found Plaintiff to have moderate restrictions in daily activities.

The ALJ only found mild limitations in Plaintiff's social functioning and her ability to maintain concentration, persistence, or pace. Plaintiff testified that she lives with her son and niece, who help her out quite a bit. Plaintiff made no mention of her inability to get along with them. Plaintiff stated that she goes to the grocery store with her niece and she rides around in the motorized chair while her niece pushes the basket. Plaintiff testified that she does not trust people and she does not like being around a lot of people. The ALJ found no episodes of decompensation, which have been of extended duration. The ALJ explained that the medical records reflect that Plaintiff has never received any mental health inpatient treatment or emergency mental health treatment. Although the Plaintiff's GAF score was assessed at 50 in May and October of 2009, Plaintiff quit taking her medication and her symptoms had improved by December 2009.

The ALJ noted that although Sarah Rasco, Plaintiff's treating psychiatrist, opined in October of 2009 that Plaintiff had extreme loss in her abilities, *inter alia,* to maintain concentration for extended periods of time and to act appropriately with the general public, the ALJ accorded her opinion little weight. (Tr. 115.) The ALJ explained that her opinion was inconsistent with Plaintiff's mental health records. Just one month after Dr. Rasco provided her opinion, Plaintiff reported to Metrocare with no complaints. In December of 2009, the clinician noted that Plaintiff was no longer suicidal, homicidal, or having signs of psychosis. Plaintiff reported being sad sometimes because it was Christmas, but she also stated that she was sleeping well and her appetite was okay. Plaintiff made a follow-up appointment in February 2010, but she failed to show up for the appointment. Dr. Rasco diagnosed Plaintiff with schizophrenia, but the ME explained that such a diagnosis was not supported by the record. The ME emphasized that Plaintiff did not receive an Axis I diagnosis during the nine years she was in prison. Additionally, Plaintiff never received any psychiatric treatment while in prison. The ME testified that a person with schizophrenia, who was not taking medication, would have at least one overt psychotic episode over the course of nine years in prison. The ME stated that people with schizophrenia do not do well in prison.

While the ALJ failed to discuss the functional limitations from Plaintiff's depression, there simply were no records of any such limitations. While incarcerated in prison, records indicated that Plaintiff complained of depression several times. However, Plaintiff was never placed on any medication for her depression. A March 23, 2008 evaluation diagnosed Plaintiff with depression and anxiety due to social stressors. Plaintiff was prescribed Celexa. However, the evaluation was brief and the doctor indicated that Plaintiff was depressed because she was losing her housing. There was

no follow-up treatment. There simply is no evidence that supports any limitations as a result of Plaintiff's depression.

The Court finds that although the ALJ did not use a PRT form in performing the special technique, the form is not a mandatory requirement under the SSA regulations. *See* 20 C.F.R. § 416.920a(e). Furthermore, the ALJ complied with the regulations as outlined above by documenting his analysis and use of the special technique in his decision. Plaintiff's first argument is untenable.

Plaintiff's second argument that the ALJ failed to use expert evidence fails as well. The SSA regulations provide that the ALJ may evaluate the severity of a claimant's mental impairments with or without the assistance of a medical expert. *Spears v. Barnhart*, 284 F.Supp.2d 477, 486 (S.D. Tex. 2002). *See* 20 C.F.R. § 416.920a(e)(5) ("*[i]f* the administrative law judge requires the services of a medical expert to assist in applying the technique . . .") (emphasis added). The decision to call a medical expert to testify at the hearing is within the discretion of the ALJ. *Spears,* 284 F.Supp.2d at 486. Here, the ALJ did call an ME to testify at the hearing. Although the ME did not rate Plaintiff's degree of limitation in each of the four functional areas, the ME was not required to under the SSA regulations. *See supra.* The ME still provided material evidence regarding Plaintiff's mental impairments that was utilized and adopted by the ALJ. In her Reply Brief, Plaintiff concedes that the regulations do not require the use of a medical expert, however, Plaintiff argues that the "spirit" of the remand order does require an expert. (Pl.'s Reply Br. 8.)

The mandate rule provides that a lower court on remand must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of the appellate court. *Brown v. Astrue*, 597 F. Supp. 2d 691, 695 (N.D. Tex. 2009) (citing *United States v. Becerra*, 155 F.3d 740, 752 (5th Cir. 1998)). Here, Plaintiff fails to cite to any case law to support

her contention and she fails to point to any provision in the remand order directing the ALJ to use a medical expert when applying the special technique. Instead, the Court notes, that the previous provision in the remand order provides "[i]f necessary, obtain evidence from a medical expert to clarify the nature and severity of the claimant's combined impairments". (Tr. 102.) There is no express requirement for the ALJ to utilize a medical expert, and this Court declines to impose such a requirement.

Finally, Plaintiff's last argument that the ALJ did not properly analyze each of the four functional areas fails as well. As previously indicated, the ALJ provided a detailed discussion of the medical evidence regarding Plaintiff's mental impairments, and he rated the degree of limitation in each of the four functional areas. Plaintiff's contention that the ALJ failed to abide by the remand order in documenting the special technique fails.

Conflicts Between the VE and the DOT

Plaintiff contends that a conflict exists between the VE's testimony and the provisions in the DOT. (Pl.'s Br. 12.) As a result, Plaintiff claims that the ALJ failed to abide by the Appeals Council's remand order to identify and resolve any conflicts between the occupational evidence provided by the VE and information in the DOT, before relying on the VE's evidence. (*Id.* at 14.)

Under the Social Security Rulings, occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT. SSR 00-4p, 2000 SSR LEXIS 8, at *4 (December 4, 2000). As part of the ALJ's duty to fully develop the record of a hearing, the ALJ "will inquire, on the record, as to whether or not there is such consistency." *Id.* at *5. When there is an apparent unresolved conflict between VE evidence and the DOT, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE evidence to support a determination

of disability. *Id.* Neither the DOT nor the VE evidence automatically "trumps" the other when there is a conflict. *Id.* A conflict must be resolved by determining whether the explanation given by the VE is reasonable and provides a basis for relying on the VE testimony rather than on the DOT information. *Id.* The ALJ must explain in the determination or decision how any conflict that has been identified was resolved. *Id.* at *1.

As an initial matter, the Court finds that the ALJ complied with his duty under the Social Security Rulings by asking the VE whether his testimony conflicted with the DOT. (Tr. 79.) The VE responded that there was no conflict, and Plaintiff's counsel failed to present any conflicts through cross-examination. (Tr. 79-80.) Therefore, nothing at the hearing triggered the ALJ to elicit a "reasonable explanation" for any possible conflicts. *See Gaspard v. Soc. Sec. Admin. Com'r*, 609 F.Supp.2d 607, 613-14 (E.D. Tex. 2009).

Plaintiff contends, however, that such conflicts do exist. Plaintiff argues that the VE's testimony, in its entirety, demonstrates that a person limited to "simple, repetitive tasks" can perform all sedentary, unskilled work. (Pl.'s Br. 13.) Plaintiff claims this conflicts with the DOT because some sedentary, unskilled occupations require a reasoning level of 3, which is not compatible with a restriction to "simple, repetitive tasks". (*Id.* at 13-14.) *See Otte v. Comm'r, Soc. Sec. Admin.*, 3:08-CV-2078-P BF, 2010 WL 4363400, at *8 (N.D. Tex. Oct. 18, 2010), *rec adopted*, 2010 WL 4318838 (N.D. Tex. Oct. 27, 2010) ("Reasoning Level 3 is not compatible with a restriction to simple, routine, repetitive work"). Plaintiff's argument simply is not accurate.

The hypothetical presented by the ALJ to the VE limited the hypothetical person to "simple, repetitive tasks." (Tr. 78.) The VE responded that the sedentary, unskilled occupational base was comprised of 136 occupations. (*Id.*) Plaintiff claims that the VE eroded that occupational base from

136 to 121 due to the physical limitations presented in the hypothetical *only*. (Tr. 13.) However, the VE clearly testified that due to the "non-exertional limitations, the postural limitations, as well as the limitations concerning hazards" the sedentary, unskilled occupational base of 136 would be eroded down to approximately 121 occupations. (Tr. 78.) The limitation to "simple, repetitive tasks" is a non-exertional limitation, which was clearly considered by the VE in limiting the sedentary work that Plaintiff could perform. Thus, the VE's testimony does not implicitly conflict with the DOT.

Plaintiff also contends that the VE's testimony conflicts with the DOT because one of the occupations mentioned by the VE, document preparer/microfilming, has an SVP level of 3, which is inconsistent with "simple, repetitive tasks". (Pl.'s Br. 13.) Although the Court finds that a potential conflict does exist between the document preparer/microfilming occupation and the DOT's listed reasoning level, the Court need not address this conflict, as the other two occupations presented do not conflict with the DOT and have a significant number of available positions. *See Gaspard*, 609 F.Supp.2d at 617 ("[t]he Commissioner's burden at Step 5 of the sequential evaluation process . . . is satisfied by showing the existence of only *one* job with a significant number of available positions that the claimant can perform.") (citing *Evans v. Chater,* 55 F.3d 530, 532-33 (10th Cir.1995)).

The VE identified two other occupations that only require a reasoning level of one and which exist in significant numbers in the local and national economy. The VE identified the occupations of a clock and watch assembler, DOT 715.687-094, sedentary work, SVP: 1, Texas: 2,300, nationally: 50,000; and a dowel inspector, DOT 669.687-014, sedentary work, SVP: 1, Texas: 3,187, nationally: 65,000. (Tr. 78-79.) Thus, even if a conflict did exist between the document preparer/microfilming occupation and the DOT reasoning listing, there are two other occupations on which the ALJ could accurately rely in making his decision. Hence, such proffered error would

not be prejudicial and warrant a reversal of the Commissioner's decision. *See Gaspard*, 609

F.Supp.2d at 617 (holding that the alleged error by the plaintiff did not require reversal because the

VE identified two other occupations that only required a reasoning level of one and thus did not

conflict with the plaintiff's limitations). The Court concludes that the ALJ complied with the Appeal

Council's remand order regarding the VE's testimony.

Hypothetical Question Posed to the VE

Plaintiff contends that the ALJ did not comply with the Appeals Council's remand order to

pose a hypothetical question to the VE that "reflect[s] the specific capacity/limitations established

by the record as a whole." (Pl.'s Br. 15-16.) Plaintiff argues that the ALJ should have included

limitations regarding Plaintiff's hearing problems and Plaintiff's "genuine symptoms" of mental

impairments in his hypothetical question to the VE. (*Id.* at 16.)

At the hearing, the ALJ posed the following hypothetical to the VE: assume a person of

Plaintiff's age, education, and experience who can sit for 6 hours in an 8-hour workday; stand and

walk for 2 hours in an 8-hour workday; lift and carry 10 pounds occasionally, and 10 frequently; can

push or pull 10 pounds; can only occasionally crawl, squat, stoop, or bend; cannot climb ladders or

work at heights; must avoid hazardous machinery and continuous exposure to hazardous machinery;

can concentrate for extended periods of time adequately; adequately interact with co-workers, public,

or supervisors; respond appropriately to routine changes in the work environment; and can only

perform simple, repetitive tasks. (Tr. 78.)

The ALJ must incorporate all of a claimant's disabilities supported by the evidence in the

record and recognized by the ALJ into his hypothetical question. *Masterson v. Barnhart*, 309 F.3d

267, 273 (5th Cir. 2002). Here, the ALJ did not incorporate any limitations due to Plaintiff's hearing

problems because there was no medical evidence in the record to support such limitations. Plaintiff never received a medical diagnosis and she only received treatment once on November 5, 2009 from Baylor. The doctor opined that Plaintiff had an earache without an infection. She was released from Baylor the same day because her symptoms had improved. The only other records that reflect Plaintiff's hearing issues are the records from Metrocare dated November 11, 2009 and December 8, 2009. On November 11, 2009, it was noted that Plaintiff was hard of hearing. Plaintiff told the clinician that she had hearing problems because of her allergies. This visit was less than a week after her visit to Baylor where she was released with an earache. Records from Bluitt Flowers Health Center ("Bluitt Flowers") on November 13, 2009 reference Plaintiff's asthma, however, there is no mention of hearing loss. (Tr. 2369-75.) Additionally, at the hearing, the ME testified that there was some evidence of a hearing impairment, but it appeared to be asthma-related and secondary to Plaintiff's allergies. The ME also testified that there was no diagnosis of a hearing impairment or any active treatment of a hearing problem in the medical records.

Plaintiff testified that she has trouble hearing due to her diabetes, but she can hear some. (Tr. 51.) Plaintiff stated that she may need a hearing aid and she needs to go to the hospital to get her hearing checked. (Tr. 51, 62.) Plaintiff's counsel submitted medical records after the hearing to be considered by the Appeals Council. (Tr. 5-6.) However, Plaintiff fails to point to any evidence in these records which diagnose or treat Plaintiff for a hearing impairment. The Social Security Regulations impose the burden on Plaintiff to prove her impairments by objective medical evidence. "Symptoms, such as pain, fatigue, shortness of breath, weakness or nervousness, will not be found to affect an individual's ability to do basic work activities unless the individual first establishes by objective medical evidence (i.e., signs and laboratory findings) that he or she has a medically

determinable physical or mental impairment". SSR 96-3p at *2. There simply is no objective medical evidence in the record to support a disability or an impairment due to hearing loss. Subjective complaints must be corroborated by objective medical evidence. *Chambliss*, 269 F.3d at 522. Thus, Plaintiff failed to meet her burden and the ALJ accurately excluded any such alleged limitation from his hypothetical question.

Plaintiff additionally argues that the ALJ should have included limitations regarding her "genuine symptoms" of mental impairments in his hypothetical because the ALJ accepted the opinion of the ME. First, the Court points out that Plaintiff mischaracterizes the evidence. Plaintiff repeatedly claims in her Brief and her Reply Brief that "[t]he ME admits that the Plaintiff shows 'some genuine symptoms' of mental impairments." (Pl.'s Br. 13; Pl.'s Reply Br. 15.) However, the ME was reading one of the records from Metrocare where Dr. Rasco made the notation that Plaintiff had motivation for secondary gain, but that she also reported some genuine symptoms. (Tr. 75.) The ME was not stating that she believed that there were some "genuine symptoms", but instead that Dr. Rasco had opined that in her records. The ME actually testified that Plaintiff's symptoms were very subtle and that the diagnosis of schizophrenia was not sustained by the record. (Tr. 74-75.) The "genuine symptoms" which Plaintiff believes should have been included in the hypothetical include paranoia, auditory hallucinations, nervousness, thoughts of death, nightmares, and poor sleep. (Pl.'s Br. 15.) Plaintiff argues that the ALJ accepted these "genuine symptoms" reflected in the Metrocare records by accepting the opinion of the ME. (*Id.*) Plaintiff's contention is groundless.

Plaintiff is correct that the ALJ accepted the opinion of the ME. Nonetheless, as stated previously, the ME did not testify that Plaintiff had "genuine symptoms" of schizophrenia. Additionally, the ME never testified that Plaintiff had symptoms of depression. She merely advised

the ALJ that Plaintiff had been diagnosed with depression in a March 23, 2008 record. The ALJ did not accept these "genuine symptoms" and instead in his decision he indicated that Dr. Rasco's mental assessment was not supported by the medical evidence in the record. Notwithstanding, the ALJ gave Plaintiff the benefit of the doubt and found her depression and schizophrenia to be severe impairments. However, in accordance with the opinion of the ME, he did not find either impairment to be at listing-level severity. Both the ME and the ALJ noted that Plaintiff's symptoms had improved by December of 2009 and that Plaintiff was not compliant with her medication. Furthermore, the ALJ did provide for Plaintiff's mental limitations when he limited the hypothetical person to "simple, repetitive tasks". Again, this limitation was consistent with the opinion of the ME.

The Court concludes that the ALJ included limitations in his hypothetical question which he found to be supported by the record as a whole. Thus, the ALJ complied with the Appeals Council's remand order.

RFC

Plaintiff argues that the ALJ did not comply with the Appeals Council's remand order because the ALJ did not perform a function-by-function analysis in determining the RFC, and thus the RFC is not supported by substantial evidence. (Pl.'s Br. 15.) Specifically, Plaintiff contends that the RFC is not based on medical evidence, the ALJ did not address the ME's testimony that Plaintiff had "genuine symptoms" of mental impairments in the RFC, and the ALJ did not include Plaintiff's hearing impairment in the RFC. (*Id.* at 18-19.)

An individual's RFC is her ability to perform physical and mental work activities on a regular and continuing basis notwithstanding limitations from her impairments. 20 CFR §404.1545. A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SSR

96-8p at *2. The ALJ is responsible for determining a claimant's RFC. 20 CFR § 404.1546(c). In assessing the claimant's RFC, the ALJ will consider all medical evidence as well as other evidence provided by the claimant. 20 CFR §404.1545(a)(3). The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir.1988).

The ALJ determined that based on Plaintiff's age, education, work experience, medical conditions, and limitations, she retained the RFC to perform sedentary work in that she could lift and carry 10 pounds occasionally and up to 10 pounds frequently; stand and walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday. The ALJ found that Plaintiff was unable to climb ladders, ropes, or scaffolds, or work around unprotected heights or hazardous moving machinery, but she could occasionally climb ramps and stairs. In addition, the ALJ found that Plaintiff could concentrate for extended periods of time; interact appropriately with co-workers, supervisors, and the public; and respond appropriately to routine changes in the work environment. The ALJ determined that Plaintiff could perform simple, repetitive tasks.

Plaintiff contends that the ALJ's RFC assessment does not address the ME's opinion that Plaintiff exhibited "genuine symptoms" of mental impairments. However, as previously stated, Dr. Rasco opined that Plaintiff had "genuine symptoms", not the ME. The ALJ rejected the opinion of Dr. Rasco because it was not supported by the medical evidence in the record. Furthermore, the ALJ was not required to incorporate a hearing limitation into the RFC, as he did not find such impairment to be supported by the evidence in the record. *See id.*

The ALJ based his RFC assessment on the medical evidence in the record. The ALJ limited Plaintiff to "simple, repetitive tasks", consistent with the opinion of the ME. The ALJ found that

Plaintiff could concentrate for extended periods of time; interact appropriately with co-workers, supervisors, and the public; and respond appropriately to routine changes in the work environment. The ME explained that Plaintiff's symptoms were not consistent with the medical evidence. Additionally, the ALJ found Plaintiff not to be entirely credible regarding her alleged limitations because she repeatedly failed to comply with treatment and there was no objective medical evidence to support her subjective complaints. Subjective complaints must be corroborated by objective medical evidence. *Chambliss*, 269 F.3d at 522.

The medical record is replete with documentation of Plaintiff's non-compliance with her medication. Furthermore, Plaintiff quit going to Metrocare in December of 2009, as she failed to appear for her February 2010 appointment. Additionally, Plaintiff missed her August 2009 appointment. Non-compliance with treatment prescribed by physicians is grounds for a finding of not disabled. *Johnson,* 894 F.2d at 685 n.4. In October of 2009, the clinician noted that Plaintiff's visit was for her disability form and that her last visit to Metrocare was in July of 2009. Dr. Rasco even opined, on Plaintiff's first visit, that Plaintiff had motivation for secondary gain as she inquired about the process for receiving social security benefits. By November of 2009, Plaintiff had no complaints and in December of 2009, she failed to exhibit signs of psychosis and reported improved symptoms. Plaintiff's mental RFC is based on substantial medical evidence in the record.

Similarly, Plaintiff's physical RFC is based on the medical evidence in the record. The ME testified that Plaintiff should be limited to sedentary work due to her history of hyptertension, diabetes mellitus, microvascular disease, a stroke, and congestive heart failure. The ME testified that Plaintiff quits taking her blood pressure medication, calls the ambulance and goes to the emergency room, complains of having a stroke, the doctors run tests on her and find nothing neurologically

wrong with her, and then ultimately she is released in stable or improved condition. The ME also testified that Plaintiff's congestive heart failure diagnosis was contemporaneous with her cocaine abuse, and that since then her heart failure has been relatively stable. The ME testified that Plaintiff did have a stroke, but there is no evidence of an ongoing stroke and Plaintiff's symptoms of weakness and slurred speech always clear up.

At the hearing, Plaintiff testified that her legs are weak and she has pain and numbness in the right side of her body. Plaintiff testified that she needs help getting dressed, taking a shower, making her bed, grocery shopping, and driving. Plaintiff stated that she gets dizzy and has headaches. Plaintiff testified that she mainly watches television during the day either sitting or laying down. The ME explained that these subjective complaints were not supported by the evidence in the record. Additionally, as previously stated, the ALJ found Plaintiff's testimony not entirely credible. At the hearing, Plaintiff stated that she had not used cocaine since 2007. However, on March 23, 2008, she told the doctor at Baylor that she "uses crack and marijuana occasionally." (Tr. 2101-02.) On this same date, Plaintiff was diagnosed with depression and anxiety due to social stressors. This inconsistency further lessens the credibility of Plaintiff.

In sum, the Court finds that the ALJ performed a function-by-function assessment of Plaintiff's work-related abilities by including a narrative discussion of how the evidence supports his conclusions regarding Plaintiff's limitations, utilizing both medical evidence and non-medical

facts.[9] SSR 96-8p at *7. Furthermore, the RFC is supported by substantial evidence. The ALJ complied with the Appeals Council's remand order.

**Whether the Hypothetical Question to the VE Incorporated all of Plaintiff's Limitations**

The argument presented here is similar to Plaintiff's previous argument that the hypothetical question presented to the VE was insufficient. However, Plaintiff presents a few new contentions which this Court will briefly address. Plaintiff alleges that the hypothetical question should have included limitations regarding the ALJ's findings in the four broad functional areas. (Pl.'s Br. 21-22.) Namely, the ALJ should have included that Plaintiff had mild limitations in social functioning and in her ability to maintain concentration, persistence, or pace; moderate limitations in her daily living activities; and no episodes of decompensation. (*Id.*)

Plaintiff argues that even though the limitations regarding her social functioning and ability to maintain concentration, persistence, or pace were mild, the ALJ still should have included them in his hypothetical. (*Id.* at 22-23.) Plaintiff cites to *Tusken v. Astrue,* No. 4:08-CV-657-A, 2010 WL 2891076 (N.D. Tex. May 25, 2010) to support her argument. However, this case is distinguishable from the matter at hand. In *Tusken,* the ALJ found the plaintiff to have mild limitations in social functioning and in maintaining concentration, persistence, or pace, but he failed to include any mental limitations in either the RFC or his hypothetical question. *Id.* at *11-12. Instead, he stated "[t]here are no severe nonexertional limitations." *Id.* at *11. By contrast, in this case, the ALJ found Plaintiff could concentrate for extended periods of time; interact appropriately with co-workers,

---

[9] The Court notes that in his decision, the ALJ went into much greater detail concerning the physical medical evidence than the Court has in this section. However, Plaintiff's argument centers around Plaintiff's mental RFC assessment and not her physical RFC assessment. In fact, Plaintiff failed to allege any specific physical limitations which should have been included in the RFC but were not.

supervisors, and the public; and respond appropriately to routine changes in the work environment, but that she could only perform simple, repetitive tasks. Thus, the ALJ did account for Plaintiff's mental limitations, unlike the ALJ in *Tusken.*

Plaintiff cites to *Windham v. Astrue,* No. 07-1463, 2008 WL 3884336 (W.D. La. July 13, 2008) for her contention that all four of the functional limitations must be included in the hypothetical question. (Pl.'s Br. 23.) However, the *Windham* case is also distinguishable from this case. In *Windham,* the ALJ found "marked" limitations in the plaintiff's ability to maintain social functioning, however, he failed to include any limitation in the area of social functioning in his hypothetical question or RFC assessment. 2008 WL 3884336, at *3. The court found this to be prejudicial error. *Id.* By contrast, the ALJ in this case, found no "marked" limitations in any of the four functional areas, thus the *Windham* case is inapplicable. Furthermore, Plaintiff's argument that the ALJ should have included limitations in the hypothetical regarding his finding of no episodes of decompensation is self-defeating. If the ALJ found that Plaintiff had no episodes of decompensation then it would logically follow that there would be no limitations concerning episodes of decompensation. Additionally, the ALJ found Plaintiff to have moderate restrictions in her daily living activities, however, he also explained that Plaintiff's credibility regarding her activities was not entirely credible and the ME testified that Plaintiff's subjective complaints were not supported by the objective medical evidence. The ALJ properly incorporated Plaintiff's moderate daily living activities in restricting Plaintiff to "simple, repetitive tasks".

Plaintiff's last argument is that a limitation to "simple, repetitive tasks" does not incorporate mild deficiencies in concentration, persistence, or pace. (Pl.'s Br. 23.) Plaintiff cites to *Webb v. Astrue,* 4:08-CV-747-Y, 2010 WL 1644898 (N.D. Tex. Mar. 2, 2010) in support of her contention.

However, the *Webb* case is distinguishable from this case because the ALJ found the plaintiff to have moderate difficulties in concentration, persistence, or pace. 2010 WL 1644898, at *13. Here, the ALJ only found Plaintiff to have mild difficulties. Additionally, the *Webb* case cites to *Adams v. Astrue,* which holds that moderate difficulties in maintaining concentration, persistence, or pace are adequately captured in a limitation to simple, repetitive, routine tasks. No. CV07-1248, 2008 WL 2812835, at *4 (W.D. La. June 30, 2008). Plaintiff additionally cites to *Voyles v. Commissioner of Social Security,* 3:10-CV-0652-B, 2011 WL 825711 (N.D. Tex. Feb. 16, 2011). However, similar to the ALJ in *Webb,* the ALJ in *Voyles* found the plaintiff to have moderate deficiencies in maintaining concentration, persistence, or pace. 2011 WL 825711, at *9. Neither of the cases Plaintiff cites are applicable here. Plaintiff fails to present this Court with any case law, and this Court similarly has found none, which holds that mild difficulties in maintaining concentration, persistence, or pace are not adequately captured in a limitation to "simple, repetitive tasks".

The Court finds that the ALJ's hypothetical question to the VE sufficiently included his findings and limitations in the four broad functional areas. Thus, the ALJ could properly rely on the VE's testimony in making his Step 5 determination.

### Whether the ALJ Complied with Social Security Rulings Regarding Plaintiff's Non-Compliance with Medical Treatment

Plaintiff's final argument is that the ALJ made the implicit determination that Plaintiff's non-compliance with medical treatment precluded disability. (Pl.'s Br. 24-25.) Thus, Plaintiff contends that pursuant to Social Security Regulations and case law, the ALJ was required to adhere to certain procedures before making such a finding. (*Id.*) Plaintiff claims that the ALJ should have abided by the following regulatory procedure:

> Based on the evidence in file, SSA may decide that it appears that
> the claimant or beneficiary does not have a good reason for failing
> to follow treatment as prescribed by a treating source and that the
> treatment is expected to restore ability to engage in any SGA (or
> gainful activity, as appropriate). However, before a determination
> is made, the individual . . . will be informed of this fact and of its
> effect on eligibility for benefits. The individual will be afforded an
> opportunity to undergo the prescribed treatment or to show
> justifiable cause for failing to do so.

SSR 82-59, 1982 WL 31384, at *5. However, the policy statement for this regulation states that "[a]n

individual who would otherwise be found to be under a disability, but who fails without justifiable

cause to follow treatment . . . which the SSA determines can be expected to restore the individual's

ability to work, cannot by virtue of such "failure" be found to be under a disability." *Id.* at *1. Here,

the ALJ did not find any of Plaintiff's impairments to be disabling. Furthermore, the ALJ did not find

that if Plaintiff would have followed her treatment regime then her ability to work would have been

restored. Instead, the ALJ concluded that Plaintiff's failure to take her medications as prescribed and

appear for follow-up visits, lessened her credibility regarding the symptoms and pain she alleged.

Plaintiff cites to *Lindsey v. Astrue,* No. 3-09-CV-1649, 2011 WL 817173 (N.D. Tex. Mar. 9,

2011) to support her position. In *Lindsey,* this Court found that although SSR 82-59 applies to explicit

determinations of non-compliance or substance abuse after a finding that the plaintiff is disabled at

step 5, the regulation can also apply where the ALJ makes an implicit determination of non-

compliance or substance abuse prior to step 5. *See id.* at *8. This Court explained that the ALJ in

*Lindsey* "relied almost exclusively" on substance abuse and non-compliance with treatment to

determine Plaintiff's RFC and to find Plaintiff not disabled. *Id.* The ALJ's decision in *Lindsey* made

the following notations "with treatment compliance, the claimant would not have been precluded

from working", "with treatment compliance and sobriety, the claimant would be able to meet the

demands of competitive work", and "with medication compliance and sobriety, the claimant has experienced at most moderate functional limitations . . . [and] could perform the demands of simple work." *Id.*

Here, however, the ALJ made no such findings. The ALJ merely utilized Plaintiff's non-compliance with prescribed treatment as a factor in assessing Plaintiff's credibility. The ALJ stated that "[t]his failure on the part of the claimant to follow up on her mental health treatment reduces her credibility in the frequency and severity of her symptoms", and "[t]his non-compliance by the claimant with her prescribed medication reduces her credibility . . . [w]ere her symptoms as limiting as she has alleged, she likely would have taken her medication as prescribed." (Tr. 110-11, 113.) Furthermore, unlike in *Lindsey,* the record here is replete with evidence of Plaintiff's failure to take, not only medication for her mental health issues, but also medication for her blood pressure and diabetes. The Court finds that the ALJ properly considered Plaintiff's non-compliance with prescribed treatment as one factor in assessing Plaintiff's credibility.[10]

Plaintiff also cites to *Ibarra v. Commissioner of Social Security,* 92 F.Supp.2d 1084, (D. Or. 2000) and *Beckett v. Astrue,* No. 3-09-CV-1058-BD, 2010 WL 4883225 (N.D. Tex. Dec. 1, 2010). However, like *Lindsey,* both of these cases are distinguishable. In *Ibarra,* the court found that the ALJ's comments and his ultimate finding that the plaintiff was not disabled was based significantly "on his expressed perception that her failure to follow a prescribed treatment caused her [bipolar]

---

[10] The Court notes that the ALJ utilized Plaintiff's inconsistencies in her testimony as another factor in assessing her credibility. For example, as the Court has previously noted, Plaintiff testified that she last used cocaine in 2007, but records in March of 2008 indicated that she was still using crack cocaine occasionally. Additionally, Plaintiff testified that she seeks treatment at Metrocare once a month. However, Metrocare records reflected that Plaintiff failed to appear for 3 months between July and October of 2009, and that she quit going to Metrocare in December of 2009.

condition to be worse than it might otherwise be." 92 F.Supp.2d at 1087. By contrast, the ALJ in this case found that Plaintiff's schizophrenia symptoms had improved by December of 2009, even though she was not consistently taking her medication. In *Beckett*, the court considered whether the plaintiff's substance abuse was a contributing factor material to her disability. 2010 WL 4883225, at *3. Here, again, Plaintiff's substance abuse was only one factor considered by the ALJ in assessing Plaintiff's credibility.

In sum, the Court concludes that the ALJ did not use Plaintiff's non-compliance with treatment, either explicitly or implicitly, in finding Plaintiff not disabled. Accordingly, the ALJ was not required to afford Plaintiff the opportunity to seek the prescribed treatment or to show justifiable cause for failing to do so before issuing his decision, as is required under the regulations. *See* SSR 82-59. Remand is not justified.

### Recommendation

For the foregoing reasons, the Court recommends that the District Court AFFIRM the decision of the Commissioner. The decision is supported by substantial evidence and the ALJ did not commit prejudicial legal error.

**SO RECOMMENDED**, February //, 2013.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after service. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).